Maurice Perkins
4836 S. Michigan Ave.
Chicago, IL. 60653


FILED
MAR 14 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Perkins,

    Plaintiff,

vs.

Langdon Neal,

    Defendant

Case No.: 07-C-0841

Judge Anderson

## EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND OPPOSING EXTENSION OF TIME

**PLAINTIFF**, Maurice Perkins on the behalf of all other voters affected by this action, ("Plaintiff") respectfully requests that Defendant(s) Counsel's motion to extend Defendant(s) Counsel's time to respond to Perkins v. Neal, ' Complaint from March 7, 2007, to March 27, 2007 be denied and a preliminary injunction be ordered. In support thereof states as follows:

## OPPOSING EXTENSION OF TIME

1. On February 14, 2007, I served a Complaint on Defendant seeking a response to my Complaint. Defense Counsel's response was therefore due on March 7, 2007.

2. On March 05, 2007, Defendant(s)' Counsel, Jenner & Block, spoke with me briefly over the telephone, Morlisa Wells from (312) 840-8684, regarding City of Chicago's Voters Commissioner Langdon Neal's motion for an extension of time. She was suggesting that we file a joint motion together for an extension of time. I told her that I could not agree to such an action in unfairness to me and all other voters who rights are being put in peril by such conflict of interest. Especially with this fast and quick paced **April 2007** upcoming run-off elections in twelve wards in Chicago in a few weeks; which, is critical to the future of Chicago and how it works. Defense Counsel filed the motion now before the Court. Such a last minute, half-hearted attempt to request an extension of time cannot be considered a good faith effort to confer with opposing counsel.

3. As detailed below, Defense Counsel has failed to demonstrate that good cause exists to justify an extension of time to May 2007, to respond to my Complaint.

4. Defense Counsel stated that an extension of time is justified here because inter alia Defense Counsel, Jenner & Block, has just been retained to represent defendant. They need time to review the complaint in order to properly respond. Dealing with all of the above matters is not an overly burdensome task for Defense Counsel, as multiple attorneys are working on this matter on behalf of the Defendant(s), not just one attorney.

5. Notwithstanding, I am not entirely unsympathetic to Defendant(s) Counsel' scheduling concerns. Had Defense Counsel properly conferred with me in good faith concerning the impact this extension would have on this upcoming run-off aldermanic elections. I would have agreed to extend the deadline to respond to My Complaint to one week longer, giving Defense Counsel

until March 14, 2007 to respond. However extending the deadline to 20 more days would give Defendant(s) Counsel more than twice the time permitted to respond under federal rules, which is entirely unreasonable. With all of the flaws and mistakes in previous elections over the years that has put in peril all Chicagoans voting rights at such a substandard level. This would be further providing assistance to such a disservice to the public. See Attachment incorporated herein as exhibit #1

**PRELIMINARY INJUNCTION**

(1.) Pursuant to Fed. R. Civ. P. 65(a), Plaintiff moves this Court for a preliminary injunction enjoining Langdon Neal in his individual and official capacity from further Chairing any elections and its processes in conflict of interest with the Constituents of the City of Chicago's Voters Rights without due and just oversight and preying this honorable court to appoint a Special Master ASAP to prevent further irreparable harm to the public interest.

(2.) We believe that this judicial review is being done at a critical time in the publics interest. This case, therefore, is similar to James Luterbach Construction Co., Inc. v. Adamkus, 781 F.2d 599 (7th Cir. 1986). *Adamkus* held that a claim does not fall under the "capable of repetition, yet evading review" standard, when the plaintiff fails to seek a preliminary injunction halting actions of a defendant, while disputing the actions of a defendant. Adamkus, 781 F.2d at 602-03. We believe, now is the appropriate time to exercise our right to take action in the publics interest for a preliminary injunction which is totally applicable. Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984) (citation omitted).

(3.) There are over twelve run-off elections about to currently take place in the City of Chicago Aldermanic races. Defendant has in past time support certain candidates in races that he currently oversee as the City of Chicago Voter's Commissioner Chairman which is a threat and contrary to equal protection in the voters right to full and complete due process in exercising their right to vote. <u>Tobin for Governor v. Illinois State Bd. of Elections</u>, 268 F.3d 517, 529 (7th Cir. 2001).

(4.) In addition, the "advancement of the public interest" is one of the traditional equitable criteria for granting preliminary injunctive relief." <u>Mayweathers v. Newland</u>, 258 F.3d 930, 938 (9th Cir. 2001) (citation omitted). In regard to all criteria for a preliminary injunction, "[t]he district court is not required to make binding findings of fact; it need only find probabilities that the necessary facts can be proved." <u>Sierra OnLine, Inc.</u>, 739 F.2d at 1423. Indeed, "[b]ecause of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendants' participation can usually be established only by circumstantial evidence." <u>United States v. Redwine</u>, 715 F.2d 315, 319 (7th Cir. 1983).

(5.) Also, we are requesting that the Courts appoint a special master to oversee this upcoming run-off election because of the suspect arbitrary disadvantage and great loss that comes because of some in which he may have supported or financially funded. There are no other legal remedies for this. Also, this action may continually be repeated over the years even if Mr. Neal was replaced by the Courts outside of a "Special Masters" appointment with another Chairman who may be politically tied to those of his views. <u>Speiser v. Randall</u>, 357 U.S. 513, 520-21 (1958) (""[T]he more important the rights at stake the more important must be the procedural safeguards

surrounding those rights. When the State undertakes to restrain unlawful advocacy it must provide procedures which are adequate to safeguard against infringement of constitutionally protected rights – rights which we value most highly and which are essential to workings of a free society .") (internal citation omitted)

(6.) There is a "'reasonable expectation' or a 'demonstrable probability' that the same controversy will recur involving the same parties." Holstein v. City of Chicago, 29 F.3d 1145, 1148 (7th Cir. 1994) (quoting Jones v. Sullivan, 938 F.2d 801, 807 (7th Cir. 1991)). "The mere physical or theoretical possibility" of the injury being repeated "is insufficient to satisfy this prong." Id.

(7.) The purpose of this complaint is to reduce voting fraud, and voting fraud impairs the right of legitimate voters to vote by diluting their votes--dilution being recognized to be an impairment of the right to vote. Purcell v. Gonzalez, 127 S. Ct. 5, 7, 166 L. Ed. 2d 1 (2006); Reynolds v. Sims, 377 U.S. 533, 555, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964); Siegel v. LePore, 234 F.3d 1163, 1199 (11th Cir. 2000).

(8.) The voter could make a photocopy of his driver's license or passport or other government-issued identification and include it with his absentee ballot, but there would be no way for the city election officials to determine whether the photo ID actually belonged to the absentee voter, since he wouldn't be presenting his face at the polling place for comparison with the photo. Griffin v. Roupas, 385 F.3d 1128, 1130-31 (7th Cir. 2004),

(9.) Anderson v. Celebrezze, 460 U.S. 780, 788-90, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983), where the Court pointed to the need to "consider the character and *magnitude* of the asserted injury" (emphasis added); Timmons v. Twin Cities Area New Party,

520 U.S. 351, 358, 117 S. Ct. 1364, 137 L. Ed. 2d 589 (1997); <u>Storer v. Brown</u>, 415 U.S. 724, 730, 94 S. Ct. 1274, 39 L. Ed. 2d 714 (1974); <u>Schulz v. Williams</u>, 44 F.3d 48, 56 (2d Cir. 1994).

(10.) The benefits of voting to the individual voter is of high priority, because it is of *instrumental* value in local election in which one vote counts. While it is elusive for political office at the state and federal level which is never decided by just one vote. The phrase "campaign for elective office" has been defined, for the purposes of the Ethics Act, as: Any activity in furtherance of an effort to influence the selection, nomination, election, or appointment of any individual to federal, state, or local public office or office in apolitical organization, or the selection, nomination, or election of Presidential or Vice-President electors [.] 5 ILCS 430/1-5 (West 2003 Supp.), as amended by Public Act 93-685, effective July 8, 2004. When the Genral Assembly specifically defines a term in a statute, that definition is authoritative evidence of legislative intent and should be given controlling effect. <u>Caterpillar Finance Corp. v. Ryan</u>, 266 Ill. App. 3d 312, 318 (1994)

(11.) <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 788-90, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983), where the Court pointed to the need to "consider the character and *magnitude* of the asserted injury" (emphasis added)

(12.) As the Court stated in *International Brotherhood of Electrical Workers v. St. Louis County*, 117 F.Supp. 2d 922, 933 (E.D. Mo. 2000), "[M]aking contributions to a party or candidate or attending picnics, rallies, dinners or other social functions for a party or candidate are nothing more than actively participating in fundraising activities for, or soliciting votes for a partisan candidate or political party[.]

(13.) "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and ***any restrictions*** on that right ***strike at the heart of representative government.***" <u>Rynold v. Sims</u>, 377 U.S. 533, 555 (1964) (emphasis added).

(14.) As the Court has noted in <u>Reeder v. Kansas City Board of Police Commissioners</u>, 733 F.2d 543, 547 (8th Cir. 1984), cert. denied, 479 U.S. 1065, 107 S.Ct. 951 (1987): "The fact is that public employees are subject to *more severe restrictions* than the public at large. \*\*\*People who become public employees receive certain benefits and undertake certain duties. One of those duties may require the surrender of rights that would otherwise be beyond the reach of governmental power. Preliminary injunction would be proper in this case.(emphasis added)

I respectfully prey this court that denial for extension of time is proper and that a special master appointment combined with a preliminary injunction is warranted in this matter.

Dated this 03-14-07

*Maurice Perkins*

4836 s. Michigan Ave.
Chicago, IL 60653
Maurice Perkins, Pro Se'

# Chicago Voter Registration Database Flawed
(October 23, 2006) - Contributed by Illinois Ballot Integrity Project

Exhibit 1

Voters' Key Personal Information Available on the Internet

A serious security vulnerability was discovered in the City of Chicago online voter registration database that would allow an identity pirate to obtain the names, addresses, birth dates and Social Security numbers of more than 1.5 million Chicago voters.

According to Bob Wilson, Cook County chair of Illinois Ballot Integrity Project, a malicious hacker could have readily change the voter registration status of individual voters or groups of voters. "For example, you could change the status of all the voters in a precinct to inactive after the registration deadline so that when one of those voters checked their online status they might believe they were ineligible and wouldn't attempt to vote," said Wilson. "Or, you could change their polling place information so they would show up at the wrong precinct on election day&hellip;the possibilities are nearly endless and could cause election day havoc," he added.

IBIP notified staff at the Chicago Board of Election Commissioners several weeks ago about the vulnerability but no action was taken. "We had hoped that the Chicago Board of Election Commissioners would take quick action to plug this hole, but apparently that's not the case," said Illinois Ballot Integrity Project member, Peter Zelchenko. He estimates it would take little more than five minutes to fix the problem. Late last week, IBIP and Zelchenko became aware that the security breach was significantly more severe than first thought. The Board was immediately notified and began taking action to alleviate the threat last Friday and began installing a new web interface over the weeekend.

Peter Zelchenko, 43rd Ward Aldermanic Candidate with more than 30 years of computer programming and database design and management experience, discovered the flaw during what he described as a "what if" session. Zelchenko said, "This situation shows how vulnerable the entire electronic voting system is. Identity theft is only one possible outcome. Election theft is another very real possibility." According to Zelchenko, "This was a very serious vulnerability. Here we have an online database that can be accessed by millions of PCs throughout the world. Clearly, this indicates that the whole system is inherently insecure."

"Problems of this type occur when systems and personnel are strained to the limit," said Wilson, continuing, "an apt analogy is that of a balloon - it only takes a small hole to let all the air out. In this case, a small hole could have let out the personal information of 2.2 million Chicagoans.

"Identity theft is a crime that everyone is concerned about," said Clare Tobin, chair of the Chicago Chapter of IBIP. "We need to be equally concerned about the theft of one of our most precious rights - the right to vote," concluded Tobin.

The Illinois Ballot Integrity Project is a not-for-profit, non-partisan civic organization dedicated to the correction of election system deficiencies and to ensuring fair, accurate, and completely transparent elections. IBIP sees paper ballots as fundamental to this quest. "It takes a lot of time, effort and people to change 10,000 paper ballots, but only a few keystrokes to change 10,000 computer votes," said Wilson. We do not oppose the use of technology in the election process, but it's obvious that today's electronic voting systems fall far short of minimum acceptable standards," he continued.

"Each of the complex steps in the voting process requires the translation of the voter's intent from one form of media to another," said Zelchenko. Every time that translation occurs, there's an opportunity for error or deliberate manipulation. A paper ballot offers one simple step that's nearly impossible to misinterpret and very difficult to hack," he concluded.