**FILED**

APR 1 0 2007 NR
APR 10, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

1  Maurice Perkins, Pro Se'
   4836 South Michigan Ave.
2  Chicago, Illinois 60653

3                        **United States District Court**

4                        **Northern District of Illinois**

5

6                                              ) **Case No.: No. 07-CV-841**
   **MAURICE PERKINS, and all other voters** )
7                                              ) **Honorable Wayne R. Andersen**
   **it will effect,**                         )
8                                              ) **Magistrate Judge Valdez**
                **Plaintiff,**                 )
9                                              )
        **vs.**                                )
10                                             )
   **LANGDON NEAL, in his individual &**       )
11
   **official capacity as the City of Chicago**

12 **Chairman of the Board of Election**

13 **Commissioners,**

14              **Defendant**

15       MOTION TO OPPOSE DEFENDANT MOTION TO DISMISS COMPLAINT

16 <u>**THE DEFENDANT'S MOTION SHOULD BE DENIED UNDER CR 56(F) TO ALLOW**</u>
17 <u>**ESSENTIAL DISCOVERY**</u>

18      Where a summary judgment motion is filed "so early in the litigation, before a party has

19 had any realistic opportunity to pursue discovery relating to its theory of the case," a 56(f) denial

20 should be granted "fairly freely" because "lightning-quick summary judgment motions can

21 impede informed resolution" on the merits. <u>Burlington Northern & Santa Fe Railroad v. The</u>

22 <u>Assiniboine and Sioux Tribes of the Fort Peck Reservation</u>, 323 F.3d 767, 773-74 (9th Cir. 2003).
   Allowing adequate time for discovery is not merely permitted by Rule 56(f) -- it is required. <u>Id.</u>

23

24      The Defendants motion underscores the need to have sufficient procedural protections in

25 place to ensure that the politicians don't use quasi-discriminatory advantages in the election

   process. <u>Speiser v. Randall</u>, 357 U.S. 513, 520-21 (1958) (""[T]he more important the rights at

MEMORANDUM OF LAW IN SUPPORT - 1          Maurice, Pro Se'
                                          4836 S. Michigan Ave.

stake the more important must be the procedural safeguards surrounding those rights. When the State undertakes to restrain unlawful advocacy it must provide procedures which are adequate to safeguard against infringement of constitutionally protected rights – rights which we value most highly and which are essential to workings of a free society .") (internal citation omitted); *see also Turner Broad. Sys. Inc. v. F.C.C.,* 512 U.S. 622, 664 (1944) (the government "must do more than simply posit the existence of the disease sought to be cured" to defend a regulation of speech) (citation omitted)).

## C.     Plaintiff Does Not Lack Article III Standing Because Plaintiff Can Establish That The Alleged Injuries Will Be Redressed By The Requested Relief.

### A.     Mis-Application of Case Law

Defendant counsel mis-applied  Plotkin v. Ryan. In Plotkin v. Ryan  First, plaintiffs' claims of standing based on their status as voters fail based on a lack of redressability.  The alleged injury-in-fact for these claims is that defendants' illegal conduct skewed the election results in favor of George Ryan and, in the process, diluted the impact of their votes.  The Plaintiffs concede in that case that they could not have the results of that  1998 gubernatorial election set aside by their suit, but ask for injunctive relief, findings of contempt, and the imposition of fines. In their reply brief, those plaintiffs argued that they had voter standing based on the Supreme Court's recent decision in Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., 120 S. Ct. 693 (2000). However, while the Court in Laidlaw, 120 S. Ct. at 707, recognized that the deterrent effect of civil penalties "afford[s] redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct," it expressly acknowledged the continued validity of Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998), which "established that citizen suitors lack standing to seek civil penalties for violations that have abated by the time of suit." Laidlaw, 120 S. Ct. at 707 (citing Steel Co., 523 U.S. at 106-07).  This is not so in Plaintiff(s) present case. At the time this suit was filed, on January 7, 1999, the election had concluded, and Ryan, a Republican, was the Governor-elect. Jesse White, the

Maurice, Pro Se'
4836 S. Michigan Ave.

Democratic candidate, had been elected Secretary of State. Plaintiff(s) case is being challenged

while we are still involved in the election process of the City of Chicago, in which will be

holding a special election for twelve ward alderpersons on April 17, 2007 just days away which

is not abated. Plaintiffs in <u>Plotkin</u> made no allegations that the bribes-for-commercial-drivers'-

licenses scheme was continuing under Secretary White's administration, contending only that

"[t]here exists in the Secretary of State's office a deep-seated culture and policy or custom of

intertwining and requiring coerced partisan political work together with the official duties of the

office," and as a result, "[t]here is a substantial likelihood that without remedial steps being taken

that such or similar unlawful conduct will continue." These allegations were purely speculative.

<u>Id.</u> At 883. The Seventh Circuit held that those allegations in that case were purely speculative.

<u>Id.</u>

**B.    Plaintiff's Complaint must Continue On Pursuant to Rule 56(F)**

In Plaintiff(s) current case it is not mere speculative but evident, and can be redressed by the

relief that is being requested. Mr. Neal has financed election candidates through his company in

which he Chaired and was chief overseer of the entire election Commission. Redress will

reassure the integrity and restore the confidence in the election process in the City of Chicago

that no other Chairperson of the Election Commissioners or Commissioner would be able to have

a conflict-of-interest against plaintiff at his taxpaying-expense in violation of his Constitutional

Rights, Guarantees and penumbras of fundamental rights. Because of these continual

governmental conflict-of-interest at the behest of the Elections commission, Plaintiff property

taxes in the predominantly African-American community has increased from $8,000 to $38,000

at 121 percent. *See Exhibit 1. and Exhibit 2.* To satisfy the injury-in-fact requirement, Right to

Life "must establish that [it] has sustained or is immediately in danger of sustaining some direct

injury." <u>Tobin for Governor v. Ill. State Bd. of Elections</u>, 268 F.3d 517, 528 (7th Cir. 2001).

Maurice, Pro Se'
4836 S. Michigan Ave.

Which had an effect on all other African American Fifteen Poorest Census Tracts Community in the City of Chicago in which Plaintiff resides within one in comparison to many non-African-American Communities? *See Exhibit3.* Plaintiff further asserts that because of years of this Conflict-of-Interest during multiple elections the African-American Community has been Gentrified, Federal Empowerment Zone Funding Mis-appropriated, Tax-Increment-Finances Squandered, and Census Dollars that were allocated for those Voters who once resided in Plaintiff area in Billion of Dollars was not used for their count and benefit. *See Exhibit 3.* Which have been used to serve the interest of the Defendant(s) Boss Mayor Daley and The City of Chicago Legal Department entities that have guaranteed him and his company no-bid contracts for years. This has allowed The Mayor to predatorily rape and molest the African-American Community of its resources and deny Plaintiff and other African-American Voters' the privileges of enjoying and gaining access to the resources that are allocated to their community. Removal of Mr. Neal and declaring and putting an injunction against any further Commissioners from being able to be appointed by The Mayor and taking a seat only if they have a financial-conflict-of-interest in receiving no-bid contracts or other royalties. This would definitely restore the public trust and faith in the Election process. Their for relief and redressability will be met.

**C. Traceability "Is Likely" to Defendant(s) Actions and Unjust Enrichment**

**In a "Report of The Committee On Finance on April 27, 2006 for the Cook County Board of Commissioners" in ATTENDANCE:**

Present: Chairman Daley, Vice Chairman Steele, Commissioners Claypool, Gorman, Hansen, Maldonado, Moreno, Peraica, Quigley, Silvestri, Sims and Suffredin (12) Absent:

Commissioners Butler, Collins, Goslin and Murphy (4) Excused Absence: President Stroger

Maurice, Pro Se'
4836 S. Michigan Ave.

(1)Also Present: Honorable David Orr – Cook County Clerk; Langdon D. Neal – Chairman, Chicago Board of Election Commissioners; Clem Balanoff – Director of Elections, Cook County Clerk's Office; Jack Blaine – President, Sequoia Voting Systems, Inc.; Richard A. Cowen – Commissioner, Chicago Board of Election Commissioners; and Gary Rycyzyn – Election Consultant. Invited Speakers 1) Honorable Maureen Murphy – Commissioner, Cook County Board of Review 2) Honorable Irvana Wilks – Mayor, Village of Mt. Prospect 3) Robert A. Wilson – Chairperson, Illinois Ballot Integrity Project, Suburban Cook County Chapter 4) Bill Wendt – Concerned Citizen 5) Hank Browne – Poll Watcher, Citizens for Claypool 6) Dave Lundy – President, Aileron Communications 7) John Holden – Election Judge 8) Marcia Williams – Poll Watcher, 8th Ward 9) Philip Lincenberg – Election Judge 10) George Clowes – Election Judge, Mount Prospect 11) Michelle Kimbrough – Election Judge, Bloom Township 12) George Blakemore – Concerned Citizen 13) Loise Dobry – Director, Independent Voters of Illinois, Independent Precinct Organization 14) Ron Baiman – Vice President, US Countvotes 15) Neal Resnikoff – Andersonville Neighbors for Peace 16) Gerald Murphy – President, Cook County Chamber of Commerce 17) Frank Avila – Legal Counsel, Illinois Committee for Honest Government 18) Clare Tobin – Illinois Ballot Integrity Project, City of Chicago Chapter 19) Barbara Burchjollla – Concerned Citizen 20) Larry Quick – Director – Quick N' Clean Foundation 21) Caroline Gibbons – Member, Women for Democracy and Fair Elections 22) Chiaka Patterson – Poll Watcher, 8th Ward 23) Randi Doeker – Poll Watcher, 7th Ward 24) Donna Roehri – Lyons Township Clerk 25) Donna Conroy – Web Manager 26) Carol Stefan – President, League of Women Voters/Palos-Orland 27) Will Crosby – Committee for a Better Chicago 28) Marj Halperin – Campaign Manager, Citizens for Claypool 29) Raymond Ernest – Poll Watcher, 41st Ward 30) Peter Zelchenko – Technologist Written Statement Only

Maurice, Pro Se'
4836 S. Michigan Ave.

1  1) Sam Yanover – Concerned Citizen 2) Bob Quane – Concerned Citizen 3) Michael Smith – Concerned Citizen.

2

3  On Page 3 of Exhibit 4 **Vice Chairman Steele** noted the following problem areas, and inquired

4  how these issues will be addressed: human error, voting materials not delivered on time, lack of

5  available paper, technical problems, jammed machines, machines not be properly set, insufficient

6  judge training (judges did not know how to merge the two systems), lack of technical assist

7  response, and mechanical and software issues.

8  **Jack Blaine, President of Sequoia Voting Systems,** replied: An independent expert has been

9  hired to review the firm and hardware. Judges will receive more hands-on training. A select

10  number of judges, perhaps one per precinct receive extra-intensive training. Technical assistants

11  will receive additional training as well.

12  **Vice Chairman Steele** noted that there were occasions when it was not possible to reach the

13  technical assistants.

14  **Mr. Blaine** replied that he would look into this issue.

15

16  **Commissioner Hansen** reiterated Vice Chairman Steele's concern that technical assistants were

17  not reachable when needed. He further stated: Having to use two machines and a tabulator is too

18  complicated. Necessary equipment can be borrowed from jurisdictions that are not holding

19  elections. Special bonding or other alternatives should have been sought out to obtain the

20  additional $20 million that this project required. Machines should be small enough that people of

21  stature can move them. It might be difficult to recruit polling judges for future elections.

22  On Page 4 of Exhibit **Commissioner Maldonado** stated that, in California in February of 2006,

23  Sequoia had a 60% failure rate with regain volume testing of both the Insight and the Insight

24

25

Maurice, Pro Se'
4836 S. Michigan Ave.

Plus machines. Commissioner Maldonado requested that the sound of this citation, page 26 of "Illinois Ballot Integrity Project" be entered into the record. (Attachment #5). Commiss **Maldonado inquired** whether Cook County and Chicago were made aware of this fact.

**Mr. Blaine** stated that he would get back to the Commissioner on whether this statistic is accurate. He noted that Sequia successfully passed certification requirements in California, and that significant testing was also conducted in Illinois further stated that all testing information is public knowledge.

**Commissioner Maldonado** asked Mr. Blaine whether he believes that Sequoia should be compensated as previously arranged, given the malfunctioning that took place on March 21st.

*Commissioner Maldonado requested that Langdon D. Neal, Chairman of the Chicago Board of Election Commissioners, comment on the issue of provisions and sanctions.*

**Chairman Neal replied:** There will be negative monetary adjustments as a result of the machines' malfunctioning.

Also, a mock election will be conducted prior to the November election.

**Commissioner Maldonado** inquired whether any memory cartridges are missing.

**Chairman Neal and Clerk Orr** replied in the negative.

Commissioner Murphy stated: First, as a correction to what the first speaker

On Page 5 of Exhibit **Commissioner Moreno** thanked the public for attending the meeting. He stated: Split precincts – where ballot styles were often mixed up - must be eliminated.

Complications of the new equipment interfacing were underestimated. He requested that Mr. Blaine and Chairman Neal pay close attention to the complaints brought forth by the public at this meeting.

Maurice, Pro Se'
4836 S. Michigan Ave.

1  **Chairman Neal** stated that the Chicago Board of Election Commissioners is currently working

2  on a report, which it will present to the Board regarding how to help judges to navigate split

3  precincts and make sure that the correct ballots are distributed. He further stated that there are

4  290 splits in Chicago, and they are usually the result of redistricting by Congress and the State

5  Legislature.

6  **Commissioner Claypool** stated the following concerns: With regard to ballot secrecy, the

7  privacy shield is too unwieldy and impractical. The ballot was too long. (And in the next election

8  there will be two ballots, so the difficulty will be larger.) There was electioneering, aided by the

9  lack of privacy. Regarding ballot security: When machines could not read a ballot, the ballot was

10  dropped into a bin or kept out in the open. Later there was a lot of handling of these ballots.

11  Someone could have filled in the blanks in those ballots that were under-voted. Regarding the

12  transportation of ballots and tapes and the counting downtown: In-precinct-results should be

13  available on election night. There were missing ballots that were supposedly reconciled

14  downtown, but there is no guarantee of this. As of today, there are no precinct-by-precinct results

15  available. In one precinct, the results were highly improbable: Several hundred ballots

16  were cast, and Commissioner Claypool's total was zero. Regarding ballot integrity: Because of

17  lost votes, there is insufficient guarantee that the votes were counted accurately. There were

18  malfunctioning paper systems; voting continued without paper trails. Early votes either did not

19  arrive at the precincts or the judges didn't know that they had arrived; some people voted twice.

20  Early and absentee votes should be physically transported to precincts. Regarding ballot

21  verification: When Commissioner Claypool voted, there was a paper malfunction and he could

22  not read the verification. Other individuals could not get printouts or tapes on election night and

23  were instead told the numbers verbally. Regarding early voting: There is not adequate oversight.

24

25

Maurice, Pro Se'
4836 S. Michigan Ave.

(While the State mandates early voting, it provides no funding for oversight.) It is prohibitively expensive for campaigns to devote staff to poll watch over many weeks and sites. Hence, the situation is rife for abuse. In one example of such abuse, senior citizens were bussed in by a special interest group, and the special interest group members accompanied the senior citizens to the polling booths and voted for them. Abuse will only become graver as early voting is more widely utilized.

**Chairman Neal** replied that the precinct counts have been available for three weeks, and that he would get these results to Commissioner Claypool as soon as possible. He further replied: Early voting will be expanding; the Board of Elections will need funding assistance. The Board will be modifying the privacy sheaths. Most large jurisdictions perform a central count; the trend is away from precinct counts. The issue of the tapes will be addressed.

**Chicago Board of Election Commissioner Cowen** made the following reply to Commissioner Claypool: Electronic voting affords greater privacy. There was funding available for only one electronic voting system per precinct. Judges need to be trained to encourage voters to use this technology.

**Commissioner Peraica** stated that the following problems had come to his attention: cartridges misplaced for several weeks, missing electrical cords, difficult-to-find switches on voting equipment, and lack of bathroom facilities. He inquired as to what is needed to avoid these problems in November.

**Mr. Blaine** replied that converting to an entirely DRE system would be the safest option.

**Clerk Orr** agreed to provide to Chairman Daley the cost of leasing DRE systems for all 5000 precincts.

**Commissioner Peraica** inquired whether the March election used an "Optic Eagle."

Maurice, Pro Se'
4836 S. Michigan Ave.

**Clerk Orr** replied in the negative.

**Commissioner Peraica** inquired whether Sequoia is traded on NASDAQ or adheres to public disclosure practices.

**Mr. Blaine** replied in the negative.

**Commissioner Peraica** inquired what technical problems existed with the machines deployed on election day, and what measures are being taken to fix them.

<u>On Page 7 0f Exhibit 4</u> **Commissioner Peraica** inquired as to when Sequoia will furnish the County Board with a report addressing the number

and nature of the technical problems possessed by the election equipment used in the March elections.

**Mr. Blaine** replied that the County Board will receive this report by July 1, 2006.

**Commissioner Peraica** inquired as to a suit filed against Sequoia in the state of Washington.

<u>On Page 8 0f Exhibit 4</u>**Commissioner Sims** recommended that the judges be provided with a tape that they can watch at home as part of their training, and that each judge be required to sign for the tape.

**Chairman Neal** replied that this type of tape was sent to judges who could not attend training; the tape was also running all day in the polling place.

**Commissioner Sims** suggested that if a judge has a history of serving in a particular polling place, that his request to remain in that place be honored.

**Chairman Daley** requested that Chairman Neal and Clerk Orr list for the record how many polling judges were not in attendance.

**Chairman Neal** replied approximately 20% of 3000 judges were not in attendance.

**Clerk Orr** replied that approximately 1000 judges were not in attendance.

Maurice, Pro Se'
4836 S. Michigan Ave.

**Commissioner Sims** asked what explanation there is for the non-attendance.

**Clerk Orr** replied that in addition to sickness and being called out of town, many found the new technology too complicated.

**Commissioner Sims** inquired as to the effectiveness of the extra County personnel, precinct representatives and students who were dispatched on election day.

**Clerk Orr** replied that these personnel were well trained and effective. He stated that he will be giving a report to the Commissioners regarding this issue.

**Commissioner Hansen** stated that at one training session of which he was made aware, ballot scanners, sample ballots, and cartridges from the ballot scanner were not available; due to the absence of these, the process of consolidation could not be demonstrated. He further stated that election judges were originally set up as an adversarial board; this balance should be preserved and kept in mind when adding other personnel.

**Commissioner Hansen** further stated that decentralization is one of the Cook County's election process' strength. He inquired how many split precincts exist.

**Clerk Orr** agreed to provide this number to the Board.

**Commissioner Hansen** inquired whether the County can convert to an entirely digital touch screen voting system. He stated that our objective should be to lead the nation in elections.

**Clerk Orr** replied that if security issues can be overcome and the funding is available, it is possible.

**Commissioner Hansen** requested that Clerk Orr address this issue in the report he submits to the Board.

Maurice, Pro Se'
4836 S. Michigan Ave.

Commissioner Suffredin noted that on March 21st, Cook County was the only jurisdiction

holding an election, whereas on November 7 Sequoia will have equipment in twenty states. He

inquired whether Sequoia will be able to provide the

appropriate technical assistance and personnel on November 7th as it did on March 21st.

Mr. Blaine replied in the affirmative.

Commissioner Suffredin further noted that, after November 7th, Cook County elections will

continue into February and April of 2007. He inquired whether Sequoia has the requisite

technical ability and the ability to provide the necessary assistance in these elections as well.

Mr. Blaine replied in the affirmative.

In just this report alone Defendant showed derelict responsibility and warranted
culpability. Defendant did not even further endeavor into the issues that was being raised
concerning such serious denials of procedural due process which has more drastic effects on the
Plaintiff and the African-American Community I which he resides and vote. It is self-evident that
it is traceable to Defendant(s) because more than likely something will go wrong in the Special
Election coming on April 12, 2007. That is why there is a rush to dismiss this case before the
election presently at-face. Defendant's Counsel argues that in Van Harken v. Chicago, 103 F. 3d
1346, 1353 (7th Cir. 1997) supports their argument that Mr. Neal's ownership of a law firm is
wholly unrelated. However, ownership and the reaping of unjust-enrichment at the voters
expense as tax payers is totally related to the subject matter and his position as Chairman of The
City of Chicago Board of Elections Commissioners Chair. While Mr. Neal's Counsel proclaim
that he is not being paid according to the outcome of the elections he oversees. What other
reasons would he be awarded millions in no-bid contracts by the Mayor of the City of Chicago?
This in and of itself proves that there is a preponderance of evidence that my inference is
secured. Therefore, the Complaint does not have to be read at its broadest to come to this
inference. Privileges and politics are at the stake of the subject matter.

"Whether the law affords fair warning of what [conduct] is proscribed." *Village of Hoffman

Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 503 (1983). Once the scheme is

Maurice, Pro Se'
4836 S. Michigan Ave.

1  established, the evidence may be either direct or circumstantial. *Irorere*, 228 F.3d at 823; *United*

2  *States v. Patterson*, 213 F. Supp. 2d 900, 910-11 (N.D. Ill. 2002)(Bucklo, J.), *aff'd*, 348 F.3d

3  218, 225-26 (7th Cir. 2003). Indeed, "[b]ecause of the secretive character of conspiracies, direct

4  evidence is elusive, and hence the existence and the defendants' participation can usually be

5  established only by circumstantial evidence." *United States v. Redwine*, 715 F.2d 315, 319 (7th

6  Cir. 1983). Plaintiff has shown that there is a "reasonable probability" that he will

7  suffer "tangible harm." *Shimer v. Washington*, 100 F.3d 506, 508 (7th Cir. 1996) (quoting *Hoover*

8  *v. Wagner*, 47 F.3d 845, 847 (7th Cir. 1995)). Given the fact that he has funded running

9  candidates through his company which is owned 99 % by him and 1 % by his wife, Mr. Neal has

10  dealt serious injury to plaintiff. "And as the Supreme Court reiterated in *Randall v. Sorrell*,

11  contribution limits must be closely drawn to a substantial government interest."

12  *North Carolina Right to Life, Inc. et al. v. Leake*, No. 5:99-798 (E.D. NC. 2007).

13

14

15

16      Plaintiff Pray this Honorable Court to deny Defendant(s) 'Motion To Dismiss Complaint

   under 56(F) To Allow Essential Discovery.

17

18

19

20

21             Dated this 10th day of April, 2007

22

23             Maurice Perkins, Pro Se'
              4836 S. Michigan Ave.

24             Chicago, Illinois 60653

25

*Exhibit 1*

# $ 33,333.78
BY 11/15/2004 (on time)

| Property Index Number (PIN) | Volume | Code | Tax Year | (Payable in) | Township |
|---|---|---|---|---|---|
| 20-03-313-051-0000 | 252 | 70036 | 2003 | (2004) | HYDE PARK |

| IF PAID LATE 11/16/2004 - 12/15/2004 | IF PAID LATE 12/16/2004 - 1/15/2005 | BY STATE LAW, LATE PENALTY IS 1.5% PER MONTH. | TAX CALCULATOR |
|---|---|---|---|
| $ 33,833.79 | $ 34,333.30 | | |

THANK YOU FOR YOUR FIRST INSTALLMENT PAYMENT OF:
$ 4,036.74 ON 02-20-04
THIS TAX BILL MAY BE USED TO PAY AT ANY LASALLE BANK THROUGH 1/15/2005.

Property location and classification for this PIN:

4500 S MICHIGAN AVE    CHICAGO IL 60653 3809    Property Classification 5-92

2002 Assessed Value
44,937

| Taxing District | 2003 Tax | 2003 Rate | Pension | 2002 Tax | 2002 Rate |
|---|---|---|---|---|---|
| WATER RECLAMATION DIST | 2,097.12 | 0.361 | 133.61 | 411.61 | 0.371 |
| PARKS-MUSEUM/AQUARIUM BOND | 145.23 | 0.025 | | 33.28 | 0.030 |
| CHICAGO PARK DISTRICT | 2,550.23 | 0.439 | 110.37 | 571.37 | 0.515 |
| SCHOOL FINANCE AUTHORITY | 877.19 | 0.151 | | 196.37 | 0.177 |
| BOARD OF EDUCATION | 18,252.47 | 3.142 | | 3,951.86 | 3.562 |
| CHICAGO COMM. COLLEGE DIST | 1,429.06 | 0.246 | | 310.65 | 0.280 |
| CHICAGO TIF-47TH/KING DR | 0.00 | 0.000 | | 0.00 | 0.000 |
| CHICAGO LIBRARY FUND | 685.48 | 0.118 | | 154.21 | 0.139 |
| CITY OF CHICAGO | 7,331.20 | 1.282 | 3,183.43 | 1,610.92 | 1.452 |
| FOREST PRESERVE DISTRICT | 342.74 | 0.059 | 17.42 | 67.68 | 0.061 |
| COUNTY OF COOK | 2,840.70 | 0.489 | 871.37 | 592.45 | 0.534 |
| COOK COUNTY HEALTH FACIL. | 819.10 | 0.141 | | 173.07 | 0.156 |
| (DO NOT PAY THESE TOTALS) | 37,370.52 | 6.433 | | 6,073.47 | 7.277 |

2003 Assessed Value
= 236,165
2003 State Equalization Factor
X 2.4598
2003 Equalized Assessed Value (EAV)
= 580,919
2003 Local Tax Rate
X 6.433%
2003 Total Tax Before Exemptions
= 37,370.52
Homeowner's Exemption
.00
Senior Citizen Exemption
.00
Senior Assessment Freeze Exemption
.00

*$29,000 increase*

*To: ZAC = 1 856 396-2735*

2003 Total Tax After Exemptions
= 37,370.52
First Installment (Due 3/02/2004)
4,036.74
Second Installment (Due 11/15/2004)
33,333.78
Total 2003 Tax (Payable in 2004)
= 37,370.52

*NO Resolution*
*MR. President*

*increase was 7%*

CHRISTINE PERKINS
4836 S MICHIGAN
CHICAGO IL

# $ 33,333.78
BY 11/15/2004 (on time)
After 11/15/04, refer to late amounts above.

See the back side of this bill for detailed payment instructions. Please include only one check and one coupon per envelope. Use of this coupon authorizes Treasurer's Office to reduce amount to prevent overpayment.

| Property Index Number (PIN) | Volume |
|---|---|
| 20-03-313-051-0000 | 252 |

Amount Paid

Include Name, PIN, address, location, phone and email on check payable to Cook County Treasurer.

<<< Name/Address Change? Check box and complete form on back to update your name and/or mailing address.

00033333780 200331305100004 00320    00033833795 00034333806 00034833810

CHRISTINE PERKINS
OR CURRENT OWNER
4836 S MICHIGAN
CHICAGO IL 60615-1005

COOK COUNTY TREASURER
PO BOX 802448
CHICAGO IL 60680-2448

*Acct # 267258*    *11/15/04*

Exhibit 2

# Property value jumps steeply in black areas

**Commissioner: South, west sides show hikes Houlihan pushes cap**

### BY ABDON M. PALLASCH
*Staff Reporter*

Cook County Commissioner Jean Collins looked at this map, and the first word that came to her mind was "redlining."

The steepest jumps in assessed property values in Chicago are concentrated in African-American neighborhoods on the South and west sides. By chance, county Assessor James Houlihan's office chose the color red to denote areas where home values increased 70 percent or more.

"That is classic redlining — how can it be anything else?" Collins said.

But not all minority neighborhoods saw those kinds of increases. Just the ones that started at the bottom and have seen high levels of new construction and gentrification: 80 percent in Lawndale, 91 percent in Washington Park and Grand Boulevard, 124 percent in Bronzeville and 161 percent in the area south of IIT.

fold," Houlihan said. "One, there is a beginning low base; two, there has been very effective city efforts to improve those neighborhoods, and three, sales of properties have increased drastically in those areas."

So the good news for residents seeing red on their part of the map is that lower crime rates and nicer streets and parks in their neighborhood mean more people want to buy home there.

"The downside is somebody who has increases in their salary of 3 [percent] or 4 percent a year will be asked to pay taxes based on 120 percent," Houlihan said.

"That's why Houlihan is pushing a bill in Springfield to cap assessment hikes at 7 percent a year. The bill failed because legislators outside Cook County said it left them out. Houlihan said he hopes to resubmit a more friendly version.

In the meantime, a homeowner who saw an assessment double need not worry about seeing the tax bill double when the new rate comes out in August. Since the values of just about all homes in Chicago went up, the correspon-

**MAYOR RESPONDS:** Daley wants relief from Springfield. Page 41A.



## INCREASES IN ASSESSED VALUES IN ALL 50 WARDS
### Citywide average: 32%

**Median Increase**

- 0-7%
- 7.1-21%
- 21.1-30%
- 30.1-50%
- 50.1-70%
- 70.1% & up
- Contains no residential parcels

*Exhibit 3*

# Federal Dollars Land in Black Districts

### By Pamela A. Lewis

Black congressional districts in the Chicago metropolitan area brought in an average of nearly $1 billion more in 1999 federal spending than their white counterparts, much of it in programs such as housing and food assistance, shows *The Chicago Reporter*'s analysis of a unique report on federal spending.

In the six-county area's 12 districts, the federal government spent more than $30 billion in 1999, according to "What Gov-

ernment Does," released in October by the Center for National Policy, a Washington D.C.-based public policy organization chaired by former White House Chief of Staff Leon E. Panetta. The report includes a database detailing federal spending on a district-by-district basis for three states, including Illinois. The group plans to eventually expand the database to include all 50 states.

Spokesmen for the area's congressmen said they were not surprised by the Reporter's findings, but noted that federal spending depends on numerous variables

in the districts, including the age and poverty rate of residents.

"It's a matter of where the private sector meets these basic needs and where it doesn't—and where it doesn't, the government has to meet those needs," said Frank Watkins, press secretary for Rep. Jesse L. Jackson Jr.

Jackson's 2nd District, which includes parts of the city's South Side and south suburbs, has a poverty rate of 14 percent and received $2.5 billion in overall spending, sixth in the area.

And most congressmen aren't aware of all the money awarded to their districts because federal spending is difficult to track, according to the spokesmen.

"Unless a specific community has come to the congressman's office to say, 'Hey, we put in for this grant, can you help us?'—most of the time that kind of flow of money from Washington back to the community does not go through the hands of the representative's office," said Pete Jeffries, communications director for House Speaker J. Dennis Hastert, a Republican who represents the west suburban 14th District. The district got $2.4 billion, eighth locally.

The federal spending process is simply confusing, added Ellen Taylor, policy analyst for OMB Watch, a Washington D.C.-based organization that monitors the White House Office of Management and Budget. "If you ... think about this huge omnibus legislation where there is all sorts of money going in all sorts of different odd directions for all sorts of things, I don't think anybody really knows where all of this money is going."

The database broke federal spending into broad categories according to "function," such as higher education, pollution control and federal law enforcement. Social Security and Medicare accounted for nearly half of the federal spending in the state. Other big-ticket categories included mortgage credit and health care services.

Nearly $500 million of the $54 billion in federal spending in Illinois went toward miscellaneous, uncategorized or unknown items. And more than 60 percent of that money went into the 12 districts in the Chicago area.

### Immediate Needs

The three districts with African American

## Cash Flow

Davis   Rush   Schakowsky   Gutierrez   Blagojevich   Jackson

Lipinski   Hastert   Hyde   Kirk   Biggert   Crane

In 1999, minority congressional districts in the Chicago metropolitan area typically received more federal dollars than their white counterparts. The black and Latino districts also have the region's highest poverty rates.

| District | Representative | District Race | Poverty Rate (%) | Rank | Federal Spending (billions) | Rank |
|---|---|---|---|---|---|---|
| 7 | Danny K. Davis | Black | 21 | 1 | 3.7 | 1 |
| 1 | Bobby L. Rush | Black | 16 | 2 | 3.5 | 2 |
| 9 | James D. Schakowsky | White | 10 | 6 | 3.0 | 3 |
| 4 | Luis V. Gutierrez | Latino | 14 | 3 | 2.7 | 4 |
| 5 | Rod R. Blagojevich | White | 10 | 5 | 2.7 | 5 |
| 2 | Jesse L. Jackson, Jr. | Black | 14 | 4 | 2.5 | 6 |
| 3 | William Lipinski | White | 7 | 7 | 2.4 | 7 |
| 14 | J. Dennis Hastert | White | N/A | N/A | 2.4 | 8 |
| 6 | Henry J. Hyde | White | 3 | 10 | 2.4 | 9 |
| 10 | Mark Kirk | White | 4 | 8 | 2.1 | 10 |
| 13 | Judy Biggert | White | 3 | 11 | 1.8 | 11 |
| 8 | Philip M. Crane | White | 4 | 9 | 1.7 | 12 |

*Notes: 'District race' is determined by which racial group comprises at least 50 percent of the district population. 'Poverty rate' indicates the percentage of district residents whose income was below the federal poverty level in 1999. Data from the 2000 Census were not available for the 14th District. Sources: "What Government Does," by the Center for National Policy; U.S. Census Bureau; analyzed by The Chicago Reporter.*

—Continued on page 12

majorities—the 1st, which stretches across Chicago's South Side; the 2nd; and the 7th, which includes the West Side and most of downtown—received, on average, $3.2 billion in federal spending, compared to $2.3 billion spent in the eight districts that are at least 50 percent white. Rep. Luis V. Gutierrez's 4th District, which covers parts of the Northwest and Southwest sides and is 70 percent Latino, got $2.7 billion.

The minority districts are all represented by Democrats, as are three white districts in Chicago. Republicans hold all five suburban district seats.

Urban districts have greater needs for roads, public transportation and assistance for low-income residents, said Ira Cohen, director of issues and communications for 7th District Rep. Danny K. Davis. Cohen pointed out that the district includes some of the largest public housing complexes in the country, which also require a lot of federal money.

The district received $3.7 billion in 1999, the most in Illinois, including $106 million for housing assistance and $76 million for ground transportation.

"They're projects that obviously impact much of Chicago, and to say they're targeted to the 7th District is oversimplifying it," he said.

Billy Weinberg, press secretary for Gutierrez, added that, because many of the region's services and resources are located in the city, the urban districts bear the financial burden of running them. For example, he said, the local office of the U.S. Immigration and Naturalization Service is located at 10 W. Jackson Blvd. in downtown Chicago, but constituents from districts across the area rely on its services.

The Reporter's analysis also shows the districts with the highest poverty rates generally received the most money, especially in direct aid—for housing, food and other kinds of immediate needs.

According to data from the 2000 census, the 7th District has a poverty rate of 21 percent, highest in the area. In addition to housing assistance, the district received $179 million in food and nutrition assistance. The three black districts received 28 percent of the entire state's food assistance.

Rep. Judy Biggert's southwest suburban 13th District, with the area's lowest poverty rate at 3 percent, got $28 million for food programs and $640,000 for housing.

With a poverty rate at 7 percent, seventh in the area, Rep. William Lipinski's white 3rd District on Chicago's Southwest Side got $229 million in direct aid, eighth locally. In 1999 it received a total of $2.4 billion, seventh in the area.

The 8th District, in the northwest suburbs, has a poverty rate of 4 percent and ranked third to last in spending. The database shows a negative balance of more than half a million dollars for housing aid in the district in 1999.

This means that the money was likely returned unspent, said Robert J. Brand, president and founder of Solutions for Progress, a nonprofit consulting firm based in Philadelphia that helped generate the database. Randy Skoglund, press secretary for 8th District Rep. Philip M. Crane, said he didn't "know where [the Reporter] got that information," and declined to comment further.

## Pet Projects

Rep. Janice D. Schakowsky's North Side and north suburban 9th District, which has a white majority, received $3 billion, the area's third largest amount overall. Schakowsky's district has the region's sixth-highest poverty rate, 10 percent, according to census data. In 1999 the district got the area's sixth-most in direct aid, $339 million.

Schakowsky believes "taking care of our domestic needs and health care and education" is a priority, said Nadeam Elshami, Schakowsky's press secretary. "We're happy when a community or a school or whoever receives federal money that they need whether we helped them or not."

Other congressional officials agreed that they each have pet projects they work hard to fund.

"There are certain projects that stick out in [Rep. Gutierrez's] mind more than others," said Weinberg, citing renovations of the CTA's Blue Line and school construction.

"Really, it's a combination of lobbying and need that brings in money," said Robyn Wheeler, communications director for Rep. Bobby L. Rush, whose 1st District received $3.5 billion, second-highest in the area.

But "What Government Does" also shows that hundreds of departments, and programs are funded by the federal government, and very few are controlled, or monitored, by the congressmen whose districts receive the funds.

For example, the database shows that Rep. Henry J. Hyde's 6th District in the west and northwest suburbs got more than $2 million for energy conservation while other area districts received, on average, about 0.01 percent of that amount—$227. On the other hand, the district received almost nothing—$3—for natural resources and the environment and another $17 on general property and records management.

"I couldn't even begin to tell you why there was $3 or $17—I don't have access to any of the numbers at this time out in the district office," said Jennifer Palmer, Hyde's press secretary and legislative assistant. "There could be errors or it could be correct—I don't know without being able to see it." Palmer did not return subsequent phone calls.

Grants often come into the districts without their representatives knowing, said Taylor of OMB Watch. "But it should be the case that they are aware. I think that's probably an area where there should be more citizen involvement so that citizens have some idea what's coming in, and then they can let them know whether they should be paying more attention."

But constituents would probably be overwhelmed by the number of ways money was reported, said Weinberg of Gutierrez's office. "The more disclosure, the better," he said, though "it's important that people not miss the forest for the trees."

Mimi Mesirow, grants manager for Jackson's 2nd District, said even more information is needed to have an accurate look at how money is being spent. For instance, while the database shows the district got $16 million for veterans' housing, "I guess I would have liked more information about specifically what type of veterans' housing," she said. "And did that include discretionary grants, and competitive grants —specifically, what kind?"

Brand, who helped create the "What Government Does" project, said it was the first to take all of this federal spending data and put it into one place. But it provides the numbers—not the answers—to questions about federal spending. And it's a "herculean task [to figure out] who to ask these questions."

Taylor had no advice for comprehending it all. "In terms of how to turn the budget process into a really rational process," she said, "I'm not sure how that can be done." **ICR**

*Micah Holmquist and Rachel Kanter helped research this article.*

Exhibit 4

# REPORT OF THE COMMITTEE ON FINANCE

## April 27, 2006

The Honorable,
The Board of Commissioners of Cook County

## ATTENDANCE

Present:         Chairman Daley, Vice Chairman Steele, Commissioners Claypool, Gorman, Hansen, Maldonado, Moreno, Peraica, Quigley, Silvestri, Sims and Suffredin (12)

Absent:          Commissioners Butler, Collins, Goslin and Murphy (4)

Excused Absence:  President Stroger (1)

Also Present:     Honorable David Orr – Cook County Clerk; Langdon D. Neal – Chairman, Chicago Board of Election Commissioners; Clem Balanoff – Director of Elections, Cook County Clerk's Office; Jack Blaine – President, Sequoia Voting Systems, Inc.; Richard A. Cowen – Commissioner, Chicago Board of Election Commissioners; and Gary Rycyzyn – Election Consultant

Court Reporter:   Anthony W. Lisanti, C.S.R.

Ladies and Gentlemen:

Your Committee on Finance of the Board of Commissioners of Cook County met pursuant to notice for a public hearing on Thursday, April 27, 2006, at the hour of 10:00 A.M. in the Board Room, Room 569, County Building, 118 North Clark Street, Chicago, Illinois.

Your Committee has considered the following items and, upon adoption of this report, the recommendations are as follows:

277586          PUBLIC HEARING TO EXAMINE THE ADMINISTRATION OF THE 2006 PRIMARY ELECTION IN ALL ITS ASPECTS (PROPOSED RESOLUTION). Submitting a Proposed Resolution sponsored by John P. Daley, Peter N. Silvestri, Roberto Maldonado and President John H. Stroger, Jr., County Commissioners; Co-sponsored by Forrest Claypool, Elizabeth Ann Doody Gorman, Gregg Goslin, Carl R. Hansen, Joseph Mario Moreno, Joan Patricia Murphy, Anthony J. Peraica, Mike Quigley, Deborah Sims, Bobbie L. Steele, Larry Suffredin, Jerry Butler and Earlean Collins, County Commissioners.

### PROPOSED RESOLUTION

**WHEREAS** the 2.7 million voters in Cook County are divided between two administering jurisdictions, with 1.3 million Chicago residents registered under the aegis of the Chicago Board of Elections, and 1.4 million suburban residents registered under the aegis of the Election Division within the office of the Cook County Clerk, and

**WHEREAS** the Cook County Clerk and the Chicago Board of Elections have jointly determined it is in the best interests of all voters throughout Cook County to conduct elections under a uniform system that is similar in equipment, design, ballot format, and procedure, in all fifty Chicago wards and thirty suburban townships, and

**WHEREAS** to achieve the goal of a uniform voting system, and to ensure full

compliance with the Federal "Help America Vote" Act of 2002, the Cook County Clerk and the Chicago Board of Elections cooperated in the joint purchase of a new dual-method voting system for both paper and electronic ballots, and

**WHEREAS** the new $54 million system consists of three primary pieces of equipment; an optical scan ballot reader, a voter card activator/consolidator, and a touch screen vote recorder manufactured by Sequoia Voting Systems of California, and

**WHEREAS** all three pieces of electronic equipment were never before used in any election by the 24,000 election judges throughout Cook County, and complicated new procedures were required to issue, tabulate, consolidate, and process the ballots, and

**WHEREAS** during prior elections in 2004 and 2002, an average of 90% of all precincts had completed in-precinct counts and reported unofficial totals within one hour of the polls closing at 7:00 pm, and

**WHEREAS** in the primary election of 2006, the first such election using new ballot formats and vote tabulation equipment, 66% of all Suburban precincts still had not reported results by 11:00 pm, more than four hours after the polls had officially closed, and

**WHEREAS** fully one week after election day, election authorities in both Chicago and Suburban Cook County were still working to complete the counting of all ballots, and

**WHEREAS** the confusion and uncertainty surrounding the conduct of the 2006 Primary Election serves to undermine voter confidence in the integrity of the system, now therefore

**BE IT RESOLVED**, that the Cook County Board of Commissioners will conduct a Public Hearing to examine the administration of the 2006 Primary Election in all its aspects, including functionality and reliability of all hardware and software, training of election judges, design of procedures for the conduct of the election, and the system by which the results were reported and certified by both the Chicago Board of Elections, and the Election Division of the Cook County Clerk's Office, and

**BE IT FURTHER RESOLVED** that said hearing shall include participation from representatives of the Office of the Cook County Clerk, the Chicago Board of Elections, and Sequoia Voting Systems, Inc., and

**BE IT FURTHER RESOLVED** that upon the selection of a date, time, and location for this Public Hearing, a notice of same will be issued by the ~~Clerk of~~ Secretary to the Board of Commissioners for publication in a newspaper of general circulation.

**\*Referred to the Finance Committee as amended on April 5, 2006.**

Commissioner Silvestri requested that a letter from the Village Clerk of the Village of Norridge be made a part of the record. (Attachment #1)

Chairman Daley called upon David Orr, County Clerk, to address the Committee. (Attachment #2)

Chairman Daley called upon Langdon D. Neal, Chairman, Chicago Board of Election Commissioners, to address the Committee. (Attachment #3)

Chairman Daley called upon Jack Blaine, President, Sequoia Voting Systems, to address the Committee. (Attachment #4)

Chairman Daley asked the Secretary to the Board to call on the following public speakers.

1)  Honorable Maureen Murphy – Commissioner, Cook County Board of Review
2)  Honorable Irvana Wilks – Mayor, Village of Mt. Prospect
3)  Robert A. Wilson – Chairperson, Illinois Ballot Integrity Project, Suburban Cook County Chapter
4)  Bill Wendt – Concerned Citizen
5)  Hank Browne – Poll Watcher, Citizens for Claypool
6)  Dave Lundy – President, Aileron Communications
7)  John Holden – Election Judge
8)  Marcia Williams – Poll Watcher, 8th Ward
9)  Philip Lincenberg – Election Judge
10) George Clowes – Election Judge, Mount Prospect
11) Michelle Kimbrough – Election Judge, Bloom Township
12) George Blakemore – Concerned Citizen
13) Loise Dobry – Director, Independent Voters of Illinois, Independent Precinct Organization
14) Ron Baiman – Vice President, US Countvotes
15) Neal Resnikoff – Andersonville Neighbors for Peace
16) Gerald Murphy – President, Cook County Chamber of Commerce
17) Frank Avila – Legal Counsel, Illinois Committee for Honest Government
18) Clare Tobin – Illinois Ballot Integrity Project, City of Chicago Chapter
19) Barbara Burchjollla – Concerned Citizen
20) Larry Quick – Director – Quick N' Clean Foundation
21) Caroline Gibbons – Member, Women for Democracy and Fair Elections
22) Chiaka Patterson – Poll Watcher, 8th Ward
23) Randi Doeker – Poll Watcher, 7th Ward
24) Donna Roehri – Lyons Township Clerk
25) Donna Conroy – Web Manager
26) Carol Stefan – President, League of Women Voters/Palos-Orland
27) Will Crosby – Committee for a Better Chicago
28) Marj Halperin – Campaign Manager, Citizens for Claypool
29) Raymond Ernest – Poll Watcher, 41st Ward
30) Peter Zelchenko – Technologist

Written Statement Only

1) Sam Yanover – Concerned Citizen
2) Bob Quane – Concerned Citizen
3) Michael Smith – Concerned Citizen

Vice Chairman Steele noted the following problem areas, and inquired how these issues will be addressed:  human ‹ voting materials not delivered on time, lack of available paper, technical problems, jammed machines, machines not I properly set, insufficient judge training (judges did not know how to merge the two systems), lack of technical assist response, and mechanical and software issues.

Jack Blaine, President of Sequoia Voting Systems, replied:  An independent expert has been hired to review the firm and hardware.  Judges will receive more hands-on training.  A select number of judges, perhaps one per precinc receive extra-intensive training.  Technical assistants will receive additional training as well.

Vice Chairman Steele noted that there were occasions when it was not possible to reach the technical assistants.

Mr. Blaine replied that he would look into this issue.

Commissioner Hansen reiterated Vice Chairman Steele's concern that technical assistants were not reachable ‹ needed.  He further stated:  Having to use two machines and a tabulator is too complicated.  Necessary equipment ca borrowed from jurisdictions that are not holding elections.  Special bonding or other alternatives should have been s‹ out to obtain the additional $20 million that this project required.  Machines should be small enough that people of stature can move them.  It might be difficult to recruit polling judges for future elections.

Commissioner Maldonado inquired whether, in light of the grievances aired today, Mr. Blaine still stands behind the q

. of the mechanical and technological aspects of Sequoia's equipment.

Mr. Blaine replied that the machines will be made more user-friendly and more training will be provided.

Commissioner Maldonado stated that, in California in February of 2006, Sequoia had a 60% failure rate with rega volume testing of both the Insight and the Insight Plus machines. Commissioner Maldonado requested that the sour this citation, page 26 of "Illinois Ballot Integrity Project" be entered into the record. (Attachment #5). Commiss Maldonado inquired whether Cook County and Chicago were made aware of this fact.

Mr. Blaine stated that he would get back to the Commissioner on whether this statistic is accurate. He noted that Se successfully passed certification requirements in California, and that significant testing was also conducted in Illinois further stated that all testing information is public knowledge.

Commissioner Maldonado asked Mr. Blaine whether he believes that Sequoia should be compensated as previously arranged, given the malfunctioning that took place on March 21st.

Mr. Blaine replied in the affirmative.

Commissioner Maldonado inquired whether Sequoia was undertaking any investigation concerning machine malfunctions.

Mr. Blaine replied that Sequoia will be reviewing information supplied by the jurisdictions.

Richard A. Cowen, Commissioner, Chicago Board of Election Commissioners, stated that training has to be rethought. He voiced a concern that there may be systemic problems with the machines and that, to evaluate this possibility, the Chicago Board of Election Commissioners is retaining an independent expert.

Commissioner Maldonado inquired as to what protective provisions or sanctions will be included in the Sequoia contract for November.

Clerk Orr replied that there is a provision that the County can withhold payment if it feels that there has been a breach of contract. He does not believe there has been a breach so far.

Commissioner Maldonado inquired whether the machines being used in November will be the same used in March.

Mr. Blaine replied no, the machines being used in November will possess a new operating system.

Commissioner Maldonado requested that Langdon D. Neal, Chairman of the Chicago Board of Election Commissioners, comment on the issue of provisions and sanctions.

Chairman Neal replied: There will be negative monetary adjustments as a result of the machines' malfunctioning. Also, a mock election will be conducted prior to the November election.

Commissioner Maldonado inquired whether any memory cartridges are missing.

Chairman Neal and Clerk Orr replied in the negative.

Commissioner Murphy stated: First, as a correction to what the first speaker stated, touch screen machines were in use in suburban Cook County; every district that she visited had at least one. Ninety percent of senior citizens who participated in exit polling stated that they liked the touch screen machines. In particular, senior citizens with arthritis were relieved at not having to use punch cards. It is her understanding that every precinct will possess at least one touch screen machine for the November election. She recommends that each touch screen machine have the ability to count all of the precincts within the polling place; this could alleviate problems if one of the machines malfunctions. She believes that privacy will be a large issue in November, when there are crossover votes.

Commissioner Murphy requested leave to ask a question of Gary Rycyzyn, Election Consultant. Leave was granted.

Commissioner Murphy asked whether Mr. Rycyzyn thought that the problems surrounding the Sequoia equipment's malfunctioning are surmountable in time for the November election.

Mr. Rycyzyn replied in the affirmative, noting that training of election judges and voters will be very important.

Commissioner Murphy thanked Carol Stefan, President of the League of Women Voters, Palos-Orland, for her attendance, and for the voter training that her organization performs.

Clerk Orr stated that, in order to engender voter privacy, future training will emphasize that only the voter goes to the scanner unless a judge's assistance is needed, in which case, the security sleeve can be held over the ballot.

Commissioner Gorman thanked all of the speakers for attending, and stated the following: It is her opinion that the Chicago Board of Elections and the Cook County Election Department would be more effective if they were combined into one entity. In all the complaints she has received, all were regarding equipment malfunctioning. None indicated that election judges were at all uncomfortable with the equipment. She inquired whether the sharing of activation cards among machines was problematic.

Mr. Blaine replied in the affirmative, and stated that this sharing would not take place in November. Additionally, in November, only one tape printing will be required for transmittal, instead of the six that were necessary in March.

Commissioner Gorman inquired how many precincts were unable to transmit on the evening of March 21st.

Mr. Blaine replied that, in Chicago, 365 out of 2700 were unable to transmit. Clerk Orr replied that, in suburban Cook County, 275 out of 2380 were unable to transmit.

Commissioner Gorman inquired as to the relevance of the malfunctioning of Pennsylvania's system.

Mr. Blaine replied that this was a different system than that used by Cook County. The malfunctioning there happened in the certification process and was remedied in time for the election.

Commissioner Gorman inquired whether the paper shortage was Sequoia's responsibility.

Mr. Blaine replied that it was a confluence of events that Sequoia would be addressing.

Commissioner Gorman inquired how many Sequoia staff were present or on-call for the primary election.

Mr. Blaine replied: Approximately seventy were available a few days prior to March 21st, on March 21st, and a few days after March 21st. This number far exceeded what was required by contract.

Commissioner Gorman stated that a review should be taken, not only of Sequoia, but of all the vendors that were involved, especially Pickens-Kane Moving & Storage Company and whoever was involved concerning an instructional mailing to election judges that arrived well after the election was over. She stated that many township and municipal clerks were underutilized, especially in cases of transporting ballots. Watchdog groups, voters' leagues, students and many other astute people exist who would like to be involved and who could be utilized. She inquired whether 95% of absentee and early votes were counted.

Mr. Blaine replied in the affirmative.

Commissioner Moreno thanked the public for attending the meeting. He stated: Split precincts – where ballot styles were often mixed up - must be eliminated. Complications of the new equipment interfacing were underestimated. He requested that Mr. Blaine and Chairman Neal pay close attention to the complaints brought forth by the public at this meeting.

Chairman Neal stated that the Chicago Board of Election Commissioners is currently working on a report, which it will present to the Board regarding how to help judges to navigate split precincts and make sure that the correct ballots are distributed. He further stated that there are 290 splits in Chicago, and they are usually the result of redistricting by Congress and the State Legislature.

Commissioner Silvestri stated that he feels he was misled when he was told that the County and Sequoia would have adequate time to implement the voting equipment. He stated that the lack of foresight with regard to problems disturbed him. He inquired whether there were more problems than Clerk Orr had expected.

Clerk Orr stated that there were more, particularly with the scanners.

Commissioner Claypool stated the following concerns: With regard to ballot secrecy, the privacy shield is too unwieldy and impractical. The ballot was too long. (And in the next election there will be two ballots, so the difficulty will be larger.) There was electioneering, aided by the lack of privacy. Regarding ballot security: When machines could not read a ballot, the ballot was dropped into a bin or kept out in the open. Later there was a lot of handling of these ballots. Someone could have filled in the blanks in those ballots that were under-voted. Regarding the transportation of ballots and tapes and the counting downtown: In-precinct-results should be available on election night. There were missing ballots that were supposedly reconciled downtown, but there is no guarantee of this. As of today, there are no precinct-by-precinct results available. In one precinct, the results were highly improbable: Several hundred ballots were cast, and Commissioner Claypool's total was zero. Regarding ballot integrity: Because of lost votes, there is insufficient guarantee that the votes were counted accurately. There were malfunctioning paper systems; voting continued without paper trails. Early votes either did not arrive at the precincts or the judges didn't know that they had arrived; some people voted twice. Early and absentee votes should be physically transported to precincts. Regarding ballot verification: When Commissioner Claypool voted, there was a paper malfunction and he could not read the verification. Other individuals could not get printouts or tapes on election night and were instead told the numbers verbally. Regarding early voting: There is not adequate oversight. (While the State mandates early voting, it provides no funding for oversight.) It is prohibitively expensive for campaigns to devote staff to poll watch over many weeks and sites. Hence, the situation is rife for abuse. In one example of such abuse, senior citizens were bussed in by a special interest group, and the special interest group members accompanied the senior citizens to the polling booths and voted for them. Abuse will only become graver as early voting is more widely utilized.

Chairman Neal replied that the precinct counts have been available for three weeks, and that he would get these results to Commissioner Claypool as soon as possible. He further replied: Early voting will be expanding; the Board of Elections will need funding assistance. The Board will be modifying the privacy sheaths. Most large jurisdictions perform a central count; the trend is away from precinct counts. The issue of the tapes will be addressed.

Chicago Board of Election Commissioner Cowen made the following reply to Commissioner Claypool: Electronic voting affords greater privacy. There was funding available for only one electronic voting system per precinct. Judges need to be trained to encourage voters to use this technology.

Commissioner Peraica stated that the following problems had come to his attention: cartridges misplaced for several weeks, missing electrical cords, difficult-to-find switches on voting equipment, and lack of bathroom facilities. He inquired as to what is needed to avoid these problems in November.

Mr. Blaine replied that converting to an entirely DRE system would be the safest option.

Clerk Orr agreed to provide to Chairman Daley the cost of leasing DRE systems for all 5000 precincts.

Commissioner Peraica inquired whether the March election used an "Optic Eagle."

Clerk Orr replied in the negative.

Commissioner Peraica inquired whether Sequoia is traded on NASDAQ or adheres to public disclosure practices.

Mr. Blaine replied in the negative.

Commissioner Peraica inquired what technical problems existed with the machines deployed on election day, and what measures are being taken to fix them.

Mr. Blaine stated that they don't know the number of technical problems yet. He stated improvements will be made to the machines at no cost to the County.

Chairman Neal stated that while it is an option to hold the vendor responsible for payment for a consultant, at this time it is the responsibility jointly of Cook County and the City. He further stated that he would inform the Cook County Board of Commissioners if his office plans to proceed with the hiring of a consultant.

Clerk Orr stated that the reason that an independent consultant would be retained would be to obtain a review that is made independently of the vendor.

Commissioner Peraica stated that the payment for elections judges is insufficient. He further stated that Clem

Balanoff, Director of Elections, indicated to him that the equipment had been certified with a software glitch uncorrected.

Mr. Balanoff replied that the glitch did not affect the accuracy of the result.

Commissioner Peraica inquired whether the Board will receive a report regarding the elections equipment scheduled to be leased for the November election.

Mr. Blaine replied that the Board will be receiving a report on the "Edge" and "Insight" machines as well as the firmware and hardware that support them. Also, a mock election will be staged, and a report on this will be supplied to the Board.

Chairman Neal replied that he would try to obtain a detailed report from the State Board of Elections on the equipment being used in the November election. He further stated that although typically the State Board of Elections does not publish detailed reports, he believes that this situation warrants it.

Commissioner Peraica inquired as to when Sequoia will furnish the County Board with a report addressing the number and nature of the technical problems possessed by the election equipment used in the March elections.

Mr. Blaine replied that the County Board will receive this report by July 1, 2006.

Commissioner Peraica inquired as to a suit filed against Sequoia in the state of Washington.

Mr. Blaine replied that that suit had been dropped.

Commissioner Sims inquired whether the equipment used by Cook County in the March elections is state-of-the-art.

Mr. Blaine replied in the affirmative.

Commissioner Sims inquired whether the software being used by the equipment in November will be compatible to any upgraded machines the County might move to.

Mr. Blaine replied in the affirmative.

Commissioner Sims inquired whether the equipment can be enhanced to accommodate any change in requirements that the government might impose.

Mr. Blaine replied that Sequoia cannot foresee what future requirements the government might impose.

Commissioner Sims asked whether the boxes with voting information are locked before they leave the precinct.

Clerk Orr replied in the affirmative. He added that results, tapes and other information go to the receiving station. From there it goes immediately downtown to be counted.

Commissioner Sims recommended that the training-group size for judges be decreased.

Clerk Orr replied that the ratio they were attempting to achieve was one machine per one trainer per ten judges.

Commissioner Sims recommended that the judges be provided with a tape that they can watch at home as part of their training, and that each judge be required to sign for the tape.

Chairman Neal replied that this type of tape was sent to judges who could not attend training; the tape was also running all day in the polling place.

Commissioner Sims suggested that if a judge has a history of serving in a particular polling place, that his request to remain in that place be honored.

Chairman Daley requested that Chairman Neal and Clerk Orr list for the record how many polling judges were not in attendance.

. Chairman Neal replied approximately 20% of 3000 judges were not in attendance.

Clerk Orr replied that approximately 1000 judges were not in attendance.

Commissioner Sims asked what explanation there is for the non-attendance.

Clerk Orr replied that in addition to sickness and being called out of town, many found the new technology too complicated.

Commissioner Sims inquired as to the effectiveness of the extra County personnel, precinct representatives and students who were dispatched on election day.

Clerk Orr replied that these personnel were well trained and effective. He stated that he will be giving a report to the Commissioners regarding this issue.

Commissioner Hansen stated that at one training session of which he was made aware, ballot scanners, sample ballots, and cartridges from the ballot scanner were not available; due to the absence of these, the process of consolidation could not be demonstrated. He further stated that election judges were originally set up as an adversarial board; this balance should be preserved and kept in mind when adding other personnel. Commissioner Hansen further stated that decentralization is one of the Cook County's election process' strength. He inquired how many split precincts exist.

Clerk Orr agreed to provide this number to the Board.

Commissioner Hansen inquired whether the County can convert to an entirely digital touch screen voting system. He stated that our objective should be to lead the nation in elections.

Clerk Orr replied that if security issues can be overcome and the funding is available, it is possible.

Commissioner Hansen requested that Clerk Orr address this issue in the report he submits to the Board.

Commissioner Suffredin noted that on March 21st, Cook County was the only jurisdiction holding an election, whereas on November 7 Sequoia will have equipment in twenty states. He inquired whether Sequoia will be able to provide the appropriate technical assistance and personnel on November 7th as it did on March 21st.

Mr. Blaine replied in the affirmative.

Commissioner Suffredin further noted that, after November 7th, Cook County elections will continue into February and April of 2007. He inquired whether Sequoia has the requisite technical ability and the ability to provide the necessary assistance in these elections as well.

Mr. Blaine replied in the affirmative.

Commissioner Suffredin delivered the following explanation of the proposed amendment: The amendments requires a monthly report to the Finance Committee on each point of both the Chicago Board of Election's eleven-point corrective plan and the ten-point corrective plan of the Cook County Clerk. The amendment further requires, by June 15, a plan as to equipment modifications as needed for the election.

## AMENDMENTS TO COMMUNICATION NUMBER 277586:

**The following amendment is sponsored by Commissioners Suffredin, Daley, Silvestri, Maldonado and President Stroger; Co-sponsored by Commissioners Claypool, Gorman, Goslin, Hansen, Moreno, Murphy, Peraica, Quigley, Sims, Steele, Butler and Collins.**

### AMENDMENTS TO PROPOSED RESOLUTION

**WHEREAS** the 2.7 million voters in Cook County are divided between two administering jurisdictions, with 1.3 million Chicago residents registered under the aegis of the Chicago Board of Elections, and 1.4 million suburban residents registered under the aegis of the Election Division within the office of the Cook County Clerk, and

**WHEREAS** the Cook County Clerk and the Chicago Board of Elections have jointly determined it is in the best interests of all voters throughout Cook County to conduct elections under a uniform system that is similar in equipment, design, ballot format, and procedure, in all fifty Chicago wards and thirty suburban townships, and

**WHEREAS** to achieve the goal of a uniform voting system, and to ensure full compliance with the Federal "Help America Vote" Act of 2002, the Cook County Clerk and the Chicago Board of Elections cooperated in the joint purchase of a new dual-method voting system for both paper and electronic ballots, and

**WHEREAS** the new $54 million system consists of three primary pieces of equipment; an optical scan ballot reader, a voter card activator/consolidator, and a touch screen vote recorder manufactured by Sequoia Voting Systems, Inc. of California, and

**WHEREAS** all three pieces of electronic equipment were never before used in any election by the 24,000 election judges throughout Cook County, and complicated new procedures were required to issue, tabulate, consolidate, and process the ballots, and

**WHEREAS** during prior elections in 2004 and 2002, an average of 90% of all precincts had completed in-precinct counts and reported unofficial totals within one hour of the polls closing at 7:00 pm, and

**WHEREAS** in the primary election of 2006, the first such election using new ballot formats and vote tabulation equipment, 66% of all Suburban precincts still had not reported results by 11:00 pm, more than four hours after the polls had officially closed, and

**WHEREAS** fully one week after election day, election authorities in both Chicago and Suburban Cook County were still working to complete the counting of all ballots, and

**WHEREAS** the confusion and uncertainty surrounding the conduct of the 2006 Primary Election serves to undermine voter confidence in the integrity of the system, ~~now therefore~~ and

**WHEREAS** the Cook County Board of Commissioners Committee on Finance held a public hearing to examine the administration of the 2006 primary election on April 27, 2006. Such hearing included participation from representatives of the Office of the Cook County Clerk, the Chicago Board of Elections and Sequoia Voting Systems, Inc;

**NOW THEREFORE,** ~~BE IT RESOLVED, that the Cook County Board of Commissioners will conduct a Public Hearing to examine the administration of the 2006 Primary Election in all its aspects, including functionality and reliability of all hardware and software, training of election judges, design of procedures for the conduct of the election, and the system by which the results were reported and certified by both the Chicago Board of Elections, and the Election Division of the Cook County Clerk's Office, and~~

~~**BE IT FURTHER RESOLVED** that said hearing shall include participation from representatives of the Office of the Cook County Clerk, the Chicago Board of Elections, and Sequoia Voting Systems, Inc., and~~

~~**BE IT FURTHER RESOLVED** that upon the selection of a date, time, and location for this Public Hearing, a notice of same will be issued by the Clerk of Secretary to the Board of Commissioners for publication in a newspaper of general circulation.~~

**BE IT RESOLVED** that the Chicago Board of Elections have agreed to do the following to improve the administration of the 2006 General Election:

1. Retain an outside computer expert from a major university or high tech corporation to review all software and firmware in the current voting system, with the objective of streamlining and speeding up vote processing and reporting.

2. Appoint an administrative judge in every precinct who would receive extensive training and extra pay to ensure that the proper procedures are followed on election day. This person would be a temporary Board employee, such as those hired for the early voting program.

3. Create new procedures to simplify and expedite the merging and transmission of vote totals from the precinct polling place to the Board's central computer.

4. Extensively test all optical scanners to determine if problems existing in jamming. There were reports from some precincts that the 21 inch ballot caused the scanners to jam.

5. Create a program to interview judges of election in all 365 precincts that did not report vote totals on election night to determine if this was caused by human error, mechanical failure, or a combination of the two.

6. Conduct a random survey of judges of election and voters to determine if there were any undetected election day problems, complaints, or suggestions regarding the new voting equipment.

7. Recruit judges of election with technology skills and experience.

8. Stock the 25 Election Board receiving stations with extra supplies and equipment for speedier distribution to polling places.

9. Assign additional roving technical support to expedite responses to equipment breakdowns.

10. Increase the number of telephone lines and personnel at Election Central to answer calls and complaints.

11. Improve telephone communication with polling places and judges of election.

**BE IT FURTHER RESOLVED** THAT THE Office of the Clerk of Cook County has agreed to do the following to improve the administration of the 2006 General Election:

1. Provide Additional Judge Training

2. Create New "Equipment Manager" Election Judge Post

3. Examine Problems with Optical Scanners

4. Fix Problems with the Touch-Screen Card Activator/Accumulator

5. Address Printer Issues

6. Review Accumulation and Transmission of Results

7. Re-test Software and Equipment Prior to the November election

8. Re-evaluate Receiving Station Structure

9. Expedite Retrieval of Vote Totals If Transmission Fails

10. Improve Repair Station Response

**AND, BE IT FURTHER RESOLVED** that beginning June 1, 2006, the Chicago Board of Elections and the Office of the Clerk of Cook County shall report on a monthly basis to the Finance Committee of the Cook County Board of Commissioners on the progress of the implementation of each of the action points they have agreed to do for the improvement of the administration of the 2006 General Election.

**Additionally, Commissioner Hansen offered the following amendment, as the final paragraph of the proposed, amended resolution, as follows:**

**BE IT FURTHER RESOLVED, that** by June 15, 2006 the Chicago Board of Elections and the Clerk of Cook County shall provide a proposal to make such improvement and/or substitution of voting equipment needed,

**Commissioner Suffredin, seconded by Commissioner Hansen, moved to amend the Proposed Resolution (Communication No. 277586), as fully described above. The motion to amend carried.**

**Commissioner Suffredin, seconded by Commissioner Murphy, moved that the Resolution (Communication No. 277586) be approved and adopted, as amended. The motion carried.**

**Commissioner Suffredin, seconded by Commissioner Silvestri, moved that the Resolution, as amended (Communication No. 277586) shall also remain in Committee to provide and allow for monthly reports from both election authorities. The motion carried.**

277590      A RESOLUTION ORDERING THE COOK COUNTY CLERK TO WITHHOLD PAYMENTS TO SEQUOIA VOTING SYSTEMS, INC. (PROPOSED RESOLUTION). Submitting a Proposed Resolution sponsored by Roberto Maldonado, County Commissioner.

The attached resolution will be added to the New Items Agenda for the April 5, 2006 Cook County Board meeting. I will request that this item be referred to the Committee on Finance for further review and discussion.

The resolution orders the Cook County Clerk to withhold payments to Sequoia Voting Systems, Inc. for the electronic election machinery supplied to Cook County until a full and complete public hearing and investigation determines the extent that Sequoia's voting equipment contributed to any errors on election day and to the extreme delay in the March 21, 2006 Primary Election results.

### PROPOSED RESOLUTION

**WHEREAS,** every United States citizen has a right to participate in our democracy by casting a vote for their chosen elected official in an election administered through a fair and accurate voting process; and

**WHEREAS,** the Cook County Board of Commissioners is committed to the integrity of each vote cast by its residents and has entrusted the Cook County Clerk's office to administer and protect its election process; and

**WHEREAS,** responding to the "hanging chads" debacle of the 2000 presidential election, Congress sought to fix our voting process by implementing electronic voting, also known as "e-voting", through the Help American Vote Act (HAVA), and released $2 billion in federal funds to modernize state's voting systems by January 1, 2006; and

**WHEREAS,** in 2005, the Cook County Board, in compliance with the HAVA mandate, approved the Cook County Clerk's office recommendation of California-based Sequoia Voting Systems, Inc. to provide updated voting equipment for the suburban county precincts at a cost of $23.8 million; and

**WHEREAS,** the Chicago Board of Election Commissioners also selected Sequoia Voting Systems, Inc., approving a $28 million contract for new voting equipment in the city of Chicago; and

**WHEREAS,** in the March 21, 2006 Primary Election, Sequoia Voting Systems, Inc. launched its dual-machine e-voting system consisting of touch screen machines (primarily to aid persons with disabilities, but available to all voters) and paper ballot optical scanners; and

**WHEREAS,** with widespread reports of equipment failure coupled with human error resulting from using new technology, the 2006 Primary Election will be remembered as a ballot counting disaster, with problems delaying final vote counts for nearly a full week after election day, compared to the old-style punch card system which tabulated 90 percent of the votes within one hour of the closing of the polls; and

**WHEREAS**, although election judges were required to participate in a three-hour instructional class as mandated by the Illinois Board of Election Commissioners, roughly 4,000 of the 14,000 election judges in Chicago failed to attend a training session for the new equipment, according to Daniel W. White, Executive Director of the Illinois Board of Elections; and

**WHEREAS**, reports of equipment failure permeated election day, when optical scanners broke down and machines failed as election judges tried to merge voting results of the two systems at the close of polls; and

**WHEREAS**, defective and damaged memory cards containing vote totals prevented data from being sent via cellular technology to the central counting centers and instead data cartridges were sent via taxi to the central office; and

**WHEREAS**, one day after the polls closed, Chicago was missing 252 memory cartridges with another 162 memory cartridges unaccounted for in suburban Cook County; and

**WHEREAS**, reports of Sequoia machine malfunctions in counties across the nation during the 2004 election, including Bernalillo and Sandoval Counties in New Mexico, Snohomish County in Washington and Palm Beach County in Florida may have foreshadowed Cook County's problems with the new voting machines; and

**WHEREAS**, the implementation of "modernized" e-voting equipment in Cook County's March 21 Primary Election left many candidates, participants in the election, public officials, and voters questioning the integrity of the voting process and highly skeptical of the upcoming General Election in November.

**NOW, THEREFORE, BE IT RESOLVED**, that we the Cook County Board of Commissioners do hereby order the Cook County Clerk to withhold scheduled payments to Sequoia Voting Systems, Inc. for the election machinery supplied to Cook County until a full and complete public hearing and investigation determines the extent that Sequoia's voting equipment contributed to any errors on election day and to the extreme delay in the March 21, 2006 Primary Election results, which may prove Sequoia failed to meet its contractual obligations to the County.

\*Referred to the Finance Committee on April 5, 2006.

**Commissioner Silvestri, seconded by Commissioner Suffredin, moved to defer consideration of the Proposed Resolution (Communication No. 277590). The motion to defer carried.**

**Commissioner Silvestri moved to adjourn the meeting, seconded by Commissioner Murphy. The motion carried and the meeting was adjourned.**

Respectfully submitted,
Committee on Finance

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
John P. Daley, Chairman

Attest:

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
Michelle Harris, Secretary

The transcript for this meeting is available in the Office of the Secretary to the Board, 118 North Clark Street, Room 567, Chicago, Illinois 60602.